Counsel, please proceed. I please the court. My name is Keith Ketterling. I represent Waddell & Reed Advisors Municipal High Income Fund. I'd like to reserve five minutes, please, for rebuttal. This case involves the purchase of bonds by Waddell & Reed to fund the building of a golf course in Myrtle Creek, Oregon. Counsel, it looks to me as though a lot depends on whether Dougherty was an agent and fiduciary of the municipality at the time it sold the bonds to Waddell & Reed, or whether it was an underwriter not acting as the municipality's agent at the time it sold the bonds. Can you point me to the right language in the agreement between the municipality and Dougherty in the excerpts to resolve that? You're talking about the private placement agreement, Your Honor. I want to be following the language while you're talking, so just tell me where to look. Your Honor, what you're referring to in the excerpt of record is at 161. And that's a letter of intent sent by Dougherty that undertakes a private placement of the bonds. The term private placement, is that a term of art that indicates an agency relationship as distinct from an underwriting relationship? It can. It doesn't in all instances. It can. In this instance, we know that it does, because we have testimony from Dougherty's Mr. Thomas Strand, indicating that this relationship was contemplated to be as a placement agent for a private placement. And that, Your Honor, is at excerpts of record 128 and 129. And that's the testimony of Mr. Strand. And in that testimony, Mr. Strand indicates that it was contemplated that this would be a private placement, that Dougherty would be acting not as an underwriter. I don't see where that makes him an agent. I'm sorry?  Agent. The language by Mr. Strand that they'd be acting as a placement agent? The word agent. The word agent. He uses the word agent. He does. At excerpt of record, if you look, there's a discussion with Mr. Thomas Strand. And the question was, or the answer, the question was, what was the relationship between Dougherty and the building authority? Yeah, I'm looking at this letter of intent, which is not intended to be a Biden contract, except it describes in paragraph 12, and I don't see the language that makes him an agent as opposed to basically a wholesaler. You will not find any magic words that say agent in that letter. That letter is simply a piece of the evidence that the court had in front of it, from which it could determine that a material issue of fact was raised about whether Dougherty was indeed acting as an agent. So you're looking at ER 128, where he uses the phrase placement agent for the municipality. Correct. Dougherty would not be acting as the underwriter, but simply acting as the placement agent. That seems kind of slim. I mean, usually with a multimillion dollar underwriting agreement, there's a formal agreement that says who has what relationship to whom. Let me explain what I'm getting at. What I would expect in an underwriting agreement like this is that the underwriter would act as a fiduciary for the municipality in some respects, basically focusing on the transaction where the municipality takes the underwriter's advice in drawing up the bonds, and the underwriter agrees that if they're drawn up in the right way, the underwriter will take them off the municipality's hands. But then I would expect the underwriter to act just as a wholesaler, just like a furniture wholesaler, not for the municipality. In selling the bonds to third parties, because at that point the municipality really has no interest. The underwriter has taken them off its hands and is just trying to unload its merchandise. And finding little squibs, like in the talk about the relationship that you just pointed to, people sometimes use the word agent. But I don't know if that's enough for a genuine issue of fact, without the underwriting agreement saying so. Well, I think it is, Your Honor, because as Mr. Strand continues on, he does differentiate between a placement agent and an underwriter. And indeed, he says Doherty would not be acting as the underwriter, but simply as the placement agent. He then asks, did that arrangement subsequently change? The answer is yes. Do you recall why it changed? It looks, when I read that question, agent's not even the word of the person answering the questions. The person asking the questions appears to be distinguishing between an underwriter and somebody just making a placement. And it's not really clear whether in the answer the person is agreeing that they're not acting as the underwriter or that they mean to specify an agency relationship. I think if you read further down. Here's why I'm troubled by it. Usually when the underwriter takes the bonds off the government entity's hands, the price at which they're sold is entirely a matter of what the market is between the underwriter and whoever it can sell the bonds to. As long as there's an agency relationship, the underwriter would have a fiduciary duty with regard to the price to the government entity. And of course, it wouldn't here once they're off. Except that in this case, the testimony of Mr. Strand is also very clear that their relationship with the issuer did not change to be one of underwriting until the majority of the bonds, $3 million of the $4 million worth of bonds, had been, his words, subscribed to by Waddell and Reed. This was a different situation. This was not the typical situation that you see in the securities field where an underwriter comes in at the beginning and agrees to underwrite an issue of securities. If that had been the case, if the ultimate relationship were the relationship from the beginning, you'd have no case on jurisdiction. True? I mean, if they'd come in and scooped up everything, bought it, taken it home, and then sold it without this sort of side discussion of agency, there'd be no jurisdiction. Correct? I don't agree with that. And the first question that you asked me, Your Honor, was... Why not? Here's why. What we're talking about is not looking at these issues in a vacuum. What was the last offer to sell? We're talking about where did these securities, the offer to sell these securities, where did it originate? In this situation... I understand that. I'm asking you a different... I'm not asking you about this situation. I'm asking you a hypothetical. If the agreement had been from the start to act solely as an underwriter, simply to buy, essentially, as a wholesaler, as Judge Kleinfeld has described it, in other words, that it had started out just the way it ended up, it seems to me there'd be no jurisdiction. There'd be no issue of fact. So I guess, to me, it all depends on whether at the time of the offer, underwriting wasn't in the picture yet. There was just an agency relationship, or at least there's an issue of fact about that. So where have I gone wrong? Where you've gone wrong is, and the Rosenthal case addresses this issue, the Rosenthal case and, in fact, the Nuveen case is instructive also, because in Nuveen, they had two different types of offerings, one that was an initial offering. On reconsideration, they sought to also include securities that were purchased subsequently in the secondary market, and in that case, the court said, no, the secondary market is not part of the offer to sell. It did not originate out of the original offering. In this case, Doherty owned these bonds for a sole period of two days. Before they even owned the bonds, they knew that three million of these bonds would end up where? At Waddell & Reed. They already had a buyer. When the bonds were issued, before the bonds were issued, they had a commitment from Waddell & Reed to buy these. It was simply a pass-through transaction. If you're looking at where the offer to sell originated. That doesn't really do it for me. I mean, if you order a camera from a New York camera store, there's a good chance that they will not own the camera until they get your order, and then they will buy it from the jobber and resell it to you the same day so that they don't have to carry debt for it. It's just a matter of market power that determines when they shell out the money for the camera or probably the bonds. Is there any more you can tell about timing that would show that when Doherty contacted Waddell & Reed and arranged the sale, they were acting as the municipality's agent and not as an underwriter? The testimony that I've given you from Mr. Strand, I believe, is the strongest evidence we have. And I believe what's key in that, Your Honor, is that Mr. Strand's testimony makes clear that the relationship did change to one of being an underwriter. It makes clear that that relationship did not change until after Doherty had subscribed to the bonds. An offer had been made. Doherty had accepted. At that point, after it was without risk as to those $3 million worth of bonds, Doherty decided to become an underwriter, knowing that they would sell $3 million of these bonds that they were about to buy from the issuer straight through to Waddell & Reed. The offer in that case originated with the issuer. And whether you want to say it originated with the issuer and went through its agent, or whether it originated with the issuer and was simply a pass-through transaction, everybody knew when these bonds were issued where $3 million of them were going to go. They knew that before Doherty became an underwriter. Doherty knew that before it bought the bonds. There is no evidence in the record of any offer by Doherty subsequently to Waddell & Reed. They want you to believe that an offer occurred May 22nd, which was accepted by Doherty, and bought May 20th, and bought May 22nd. There's no evidence in the record. Let's go into the detail of that 128-129 testimony. What he says is, let's assume for purposes of this part of the discussion, that you're right. As long as they're a placement agent, they're an agent. They're not – and they're cloaked with all the aspects of agency. As I understand this, the timing was when they talked to Waddell & Reed, their placement agent, by the time they sell the bonds to Waddell & Reed, they're an underwriter. They've obtained the commitment from Waddell & Reed to buy the bonds, but they haven't yet had the transaction. When the transaction is made, then they're an underwriter. Have I got the timing right? That's correct. There was an offer made when they were a placement agent. It was accepted by Waddell & Reed. They subscribed to the bonds. After that point, after everyone knew where those 3 million bonds were going to go, Doherty decided to become an underwriter. It was not until the commitment – and it's very clear. It says, what point did the offering change from being a private placement to an underwriting? The answer, it was after we had obtained commitments from Key Bank or U.S. Bank and Waddell & Reed, and sometime prior to closing. Why wouldn't the date of the sale rather than the date of the agreement for sale be determinative? ORS 59.335 says that the Oregon Securities Law applies to offers to sell that are made in the state. ORS 59.345 says that an offer to sell is made in the state when the offer originates from the state. It all relates to the offer to sell. It does not relate to the actual sale itself. It could. It certainly could. The acts of which you're complaining are the pre-sale representations and acts. That's true. In other words, if your complaint had to do with what they did later, once they were already an underwriter, you'd have problems. But you're complaining about activities that occurred in connection with this original communication. I think you're correct in a sense. I would say that it's not determinative what our allegations are of when we think they did wrong. The issue is, does the Oregon Securities Law apply? It applies to transactions in which there's an offer to sell made in the state. Right, but then the things that went wrong have to relate to that offer to sell. Otherwise, it doesn't track, I guess, in my mind. It seems like you're fighting hard against- I don't- You don't want to take yes from the answer, do you? No, I'm happy to agree with you. I just think that there could be more to it. I don't want to mislead you. I think in this case, we have exactly what you're talking about. So you don't need more than that. If there are facts from which a trier of fact could find that the offer to sell originated in Oregon and your complaint is about the things that happened with respect to that offer to sell, you don't need more than that. By all means, we don't need more than that under the facts in this case, no. When did the golf course go broke? The golf course went broke, we allege, because there were feasibility projections that we contend were not properly done that disclosed that there were problems with the projections that were being used to market the golf course. The golf course was built in Myrtle Creek, Oregon, which is off of I-5 in the center part of the state. It's away from any real population center. It was designed to be sort of a tourist course. It never had a chance to succeed in our view because it wasn't cited in the proper spot and the proper studies weren't done to determine if it was feasible. In the evidence that we presented to the court, we showed that there were projections that were done by the issuer's own management company that cast doubt on whether the projections could ever be met, that Doherty was aware of these, that Doherty held a clandestine meeting in Kent, Washington, in order to harmonize these conflicting feasibility studies and projections. We presented evidence to the court that Doherty had reason to believe that this course, instead of opening all 18 holes by May of 1997, would only be able to open 9 holes by May of 1997 and that Doherty had this information before the offering closed. Counsel, we don't have to reach anything about the merits to resolve the issue that's before us, correct? Correct. It's purely, as it reaches us right now, a question of jurisdiction in court. And I would, you're absolutely correct. I was responding to Judge Persky. I understand. I thought he wanted to get some more information. Let me also address an issue that I think is relevant to what Judge Kleinfeld was asking me earlier, and I think your comment was that's pretty scant evidence. In the Jacobs case, State v. Jacobs, Oregon Court of Appeals, that case is instructive for a couple of reasons. One is it shows the inferences that the Oregon courts are willing to engage in in order to find an agency relationship. That case was under a criminal standard beyond a reasonable doubt. The court of appeals found that Jacobs was serving as the agent for Marshall, who was selling interests in land in Oregon. Jacobs was in California. The evidence that the court relied upon was that Jacobs held meetings with people in California. I found that a lot easier because it's real estate. Real estate is typically sold by agents for the seller, and securities often are not. For example, if I own a security and I tell my broker to sell it and you buy it because you told your broker to buy it, your transaction will have absolutely no connection to the state where the security was issued. But I have known a condo in Oregon, and I tell my real estate agent to sell it and you buy it. That's more like the case you're citing. Except they're selling interests in real property. Here we're buying bonds used to build a golf course here in Oregon. It's not the same as buying a share of stock in Citicorp. I just had a house sold. My house was just sold in California, and the sale was made not by my broker, but the sale was made by the broker for the buyer. Different than happens up in Alaska, I guess. Well, I would commend to your honors to look at Jacobs again because I think it does stand for the proposition that Oregon securities law is read expansively. The state of Oregon wants to be able to regulate offers to sell that touch upon the state, that originate upon the state, and I think in this case, the district court judge erred when he found that we did not raise an issue of material fact regarding whether Doherty was an agent for the issuer. Thank you. Thank you, counsel. May it please the court. Joe Anthony representing Doherty. I'd like to begin by answering the question posed by Judge Kleinfeld, which is why there is no genuine issue of material fact that establishes that Doherty was acting as agent for MCBA, the issuer, when it offered the bonds to Waddell. There are three operative documents, and I think that the court asked the question of counsel, my brethren, what the most operative document was, and I think he only gave you one of the three. He gave you the 12-1995 document, which was the unsigned preliminary letter between Doherty and MCBA. The letter of intent. The letter of intent that was never signed, apparently never implemented. The second important document is the preliminary official statement dated March 29, 1996. That is the document by which these bonds were offered and sold to Waddell. Where is that in the excerpt? That is in the record at 161. Thanks. The POS appears in the supplemental excerpt of record, Volume 2 at, let me rephrase it, ER 271. I'm sorry. Thanks. And then the third operative document is the bond purchase agreement itself, and that is really the question you began with, I think, Your Honor, was where do I find the operative document between Waddell and Doherty, or between Doherty and the issuer, and that appears in the Volume 2 Supplemental ER 449, and that's a signed bond purchase agreement between Myrtle Creek and Doherty by which Doherty acquired the bonds and went on the risk on these bonds. Counsel, let me ask you the following. It is not necessarily the case that you would have had to be, your client would have had to be the underwriter. In other words, theoretically, they couldn't have acted as an agent for the issuer. That's correct. And so the only real question is, on this record, whether there is evidence from which a reasonable trier of fact could find that at the time of the original offer and the time of the alleged misrepresentations, they were acting as agent for the issuer. And I'd like you to address specifically the deposition testimony from Mr. Strand in which he said that the offer changed from being a private placement to an underwriting after the commitment had already been obtained from Waddell and Lee. I will, Your Honor. That testimony does not create a genuine issue of disputed material fact for the following reason. The plaintiff itself, Waddell's person who made the decision to buy the bonds, Mr. Otterstrom, testified that he committed to buy the bonds. This was summary judgment. Pardon, sir? How could he testify? I thought this was summary judgment. He testified in deposition, and it's part of the record. You've got no cross-examination on affidavits. No, it wasn't an affidavit. It was a deposition, and he was cross-examined. And it's undisputed that he testified that he relied on the preliminary official statement March 29, 1996, and it was the only document on which he said he relied, to make his decision to buy the bonds. That was the commitment date. Isn't that a question of whether he wins or loses? In other words, let me see if I can clarify my question. If the offer to sell was made and a commitment was obtained at a time when your client was acting as an agent for the issuer, then jurisdiction would lie. If the proof is that nothing that happened then caused them to rely, then you win on the merits. But I don't understand why that would affect the jurisdictional question. In other words, just because there's jurisdiction doesn't mean you lose the case. You could win by, you know, 14 lengths. I understand that, Your Honor. What I'm addressing is the absence of any facts in the record that would support the proposition that Waddell relied on anything other than the preliminary official statement. But that's where I'm getting you away from reliance. The question isn't about reliance when it's jurisdictional. The question is what role did your client play vis-a-vis the issuer at the time it made the offer, which has nothing to do with the third party's reliance, in my opinion. That's why I guess I'm confused. Let me reiterate my response then. The facts with respect to when the offer was made indicate that the offer was not made until after the preliminary official statement was issued. There is nothing in the record. When was the offer? When was the acceptance? When was the sale? The preliminary official statement was on March 29th, 1996. When was the offer, the acceptance, and the sale? That was the preliminary official statement by which an offer is made. Then there were negotiations for some period of time. But you're saying that the offer, the first offer made was the written offer in the 329-96 preliminary statement. Correct. Not some oral offer. Right. There's no specific record reference that you can point to and say, here's a conversation where Mr. Otterstrom said, I was offered these bonds orally in February of 1996. Okay. So what we have now, taking the facts most favorably to the party opposing summary judgment, is we have a preliminary official statement, March 29, 1996. Correct. That's the offer. However, we have deposition testimony that the relationship of the authority to the municipality did not change from private placement agent to underwriter until sometime after that. Here's where that's incorrect, Your Honor. And here's not why you're incorrect, but why that characterization is incorrect. In the March 29th preliminary official statement, it's clearly indicated that Doherty is not the agent. Where does it say that? It says it. But Strand testified inconsistently with that. He said the arrangement changed after your client obtained the commitment from Wardell and Reed. That's what he says. We know that's an error. Mr. Strand, the fact that Mr. Strand made an error. Is that for a jury to decide whether he's in error? We have to look at things totally from the perspective of the other side. I agree, Your Honor, but it has to be a genuine issue of dispute. There's no dispute here because the other side conceives that it didn't commit until after it was aware that our relationship was not as agent but as owner. So the plaintiff has already disqualified itself from saying that there was an offer made before the official statement because the plaintiff didn't commit until after the official statement. So Mr. Strand was simply incorrect when he characterized in general terms what happened here. That's not a genuine dispute because plaintiff doesn't contend. It believes that Doherty was acting as agent when it made its decision to commit. Mr. Strand makes an error in his timing. Plaintiff wasn't beguiled by this in any way. Plaintiff was a sophisticated investor who read the preliminary official statement, who relied on it, and in there it says that Doherty is not the agent. It says Doherty is the underwriter. Who was Strand again? That was the underwriters? It was the underwriters, one of the representatives of the underwriter, Doherty. And in that official statement, Doherty makes clear that it is not an agent. And Waddell knew it was not an agent. Where does it say that now in the official statement? It's in the record at ER 271. And it's at the beginning of the preliminary official statement. It's the preliminary official statement. It's at the beginning, and it is throughout the preliminary official statement. And at 291, it says in the March 29th statement at page ER 291 under underwriting, the bonds are being purchased from the issuer by Doherty, subject to the terms of a bond purchase agreement between the issuer and the underwriter. Now, if Mr. Strand was mistaken as to when this relationship changed, that doesn't create a genuine issue of material fact when the buyer is aware of the real relationship as represented in the document. What do you make of Doughton's statement that I believe, I'm trying to remember where this occurs in the record, but it seemed to me that Doughton said that the first contact with Waddell and Reed was sometime after February 16th or 17th, which is well before this March date, which also supports what Strand says, or at least for purposes of summary judgment. What relevance does that have? I think Doughton's, and I think it's from his affidavit, and I think he says in the spring of 1996 he had conversations. He specifies, to my recollection, it could be completely wrong because I didn't bring it with me, but it seemed to me he used the dates February 16th or 17th as being the start date of the contacts, which is well before the March 29th date. What I make of that, Your Honor, is as this panel is well aware, in matters of this type there may be, you might inquire of an expression of interest from a variety of potential purchasers, of an expression of interest in a product which may come to market. There is no security in existence at that time. I understand that. I guess the reason for my question is you're saying there's just this freestanding mistake by Mr. Strand, and for purposes of analyzing this summary judgment record, wouldn't we have to take Doughton's comments as, for summary judgment purposes at least, being potentially corroborative? I think his, or at least my recollection of the record, is that his are sufficiently vague as to time and place. I thought they were generally in the spring, so I don't think that's sufficiently corroborative of testimony that we were somehow, Doherty was somehow acting as an agent of. When the record, the compelling written record, on which this sophisticated investor relied and was aware, demonstrates that when the offer was made and the purchase was made, there was no agency relationship. And that's unequivocal in the record. The timing really matters to me. I think if I understand you right, correct me if I don't, you're saying the buyer says that what they understood to be the offer was this preliminary official statement dated March 29, 1996. Correct. And the preliminary official statement says, the bonds are being purchased from the issuer by Doherty Doughtons as an underwriter. Correct. So the buyer could not imagine that the buyer was purchasing the bonds from an agent for the municipality. Exactly correct. The buyer says, he started talking, let's see, the seller's representative says, when we first were talking with Waddell and Reed, we were acting as a private placement agent. We didn't turn ourselves into an underwriter until we were quite confident we could unload all the bonds. And that was later, after our talks with Waddell and Reed began. You're saying that does not create a genuine issue because the buyer is the one who made the offer and the buyer knows better and said. And when the buyer dates the beginning of talks there in the spring. Have I got it right so far? Pretty much, Your Honor. I think you have it correct. When is spring here? Where I live spring is in May. In Minnesota it's sometimes July, but typically May. And remember the buyer was in Kansas, the seller was in Minnesota, so I think May is a fair approximation. Spring in Kansas, Minnesota. Roughly the same. You're saying that some places spring is February. Some places spring in Florida might be February. And February would be before the preliminary official statement. Right. But it wasn't spring where these people were. They were in Minnesota and they were in Kansas. Is there any other evidence about timing? No. The only evidence about timing, Your Honor, is the pretty clear representation statement by Waddell that the offer which it received and which it acted originated after March 29th, after Waddell was aware that it was dealing with Doherty as the owner of the bonds and not as the agent for the issuer. And I don't think there's any serious question about that. In fact, Mr. Odderstrom testified that he didn't make his decision on the offer. In fact, the first time it was presented to him, he rejected it, he said. And then later on, after looking further at the preliminary official statement and negotiating it, he made his decision to acquire the bonds. So under the Oregon statute. Who was that now? Mr. Odderstrom. He was the representative of Waddell. And under Oregon law, it seems to me that the offer by which the purchase is made, in this case the purchase made by Waddell based on an offer which occurred after the preliminary official statement, could not have originated in this state because, as we know, Doherty was not in this state. Waddell was not in this state. Waddell never visited this state. Doherty was the owner of the bonds in Minnesota. The transaction occurred in New York. And interestingly enough, Waddell could have, I suspect, brought an action in this court, in Oregon State Federal Court and the court of jurisdiction, if it had alleged a violation of the Kansas or Minnesota Blue Sky Act. But it did not do that. So what we should do is treat this deposition testimony that your adversary pointed to as testimony that is so impossible of being true that it should not create an issue or fact that's genuine. It's clearly not consistent with the known record. It does not create a genuine issue of disputed fact because it doesn't – the plaintiff acknowledges that there's an error in his statement. Strand couldn't possibly have been right because we now know for a fact that when the preliminary official statement was issued, before the commitment was made by Waddell – remember, Strand says we didn't become the owner or the underwriter until after we'd gotten Waddell's commitment. Well, they didn't get Waddell's commitment until sometime in April or May. So, ergo, Strand is simply wrong. He made a mistake. And that doesn't create a genuine issue of material fact under those circumstances. And I was mentioning that Waddell could have brought an action. It wasn't without a remedy. It could have included a claim under the Kansas or Minnesota Blue Sky Act and, in fact, moved to amend to add such a claim, and that was denied by the trial court below, and they never appealed that. They could have brought that before you. I think we're clearly correct on this offer not originating in Oregon in connection with the purchase made by Waddell, and I think the trial court was correct in its analysis in finding no genuine issue of material fact. Briefly, two other issues that I would touch on are the Bespeak's Caution Doctrine. I think that's been briefed by both sides fully, and this Court is obviously well familiar with that. We think in this particular case the Court could also find, although the District Court didn't get to this issue, this Court could find that there was sufficient cautionary language in the preliminary official statement and the official statement  And in response to Judge Ferguson's question, what happened to the golf course? Why didn't it succeed? Did the Doherty ever know that it was mismanaged? It didn't get mismanaged until after the bonds were sold. Did he have any idea at all that it was mismanaged? We do not believe. Was he oblivious to all this fact? He had no contacts with the golf course at all until? Well, the bonds were sold for the development of the golf course, then it went forward to be developed, and what happened was... Imagine the golf course was built with the money raised by the bonds. Correct. So until they'd already sold the bonds, they wouldn't have the money, they wouldn't have built it, so they couldn't mismanage it because it didn't exist yet. Well, if you look at plans, you don't get the multi-million dollar operation going without plans. I agree, and what they did was they looked at the plans and they said, this is a risky operation. We've got to project how many golfers are going to show up, we've got to project the weather, we've got to project all this. And the reason why the course failed was from all the things that were... Oh, Doherty knew that. I'm sorry? Doherty knew that. Doherty projected that. They warned everybody about that risk. They said, we might not get good weather, we might not get enough golfers, and the course failed for the reasons that were predicted. They might fail. In spite of all that, he became an underwriter. In spite of all that, they became an underwriter. They took the risk. They took the risk when they bought those bonds that Waddell might not buy them. There was no firm commitment. There was no obligation on Waddell to buy those bonds. Doherty took them on May 20th. They bought them. They bought 4.3 million or 4.9 million, and they, meaning Doherty, had no commitment that they could bind Waddell to. They had no writing by which they could say, Waddell, you have to take 3 million. Doherty went on the risk. Waddell could have walked free and clear and never made the investment. That's why Doherty wasn't acting as the agent for the issuer. That's why Doherty was taking the risk. The other issue, I think the trial court below, there's a provision for attorney's fees and staffing. If an underwriter knows that the project that he's dealing with is such a risk that nobody should buy the shares, but the underwriter goes ahead and sells them. Underwriter bonds? I don't think an underwriter would, in this case, for example, Doherty. I'm not talking about this case. Okay. Oh, theoretically. What? Theoretically, if an underwriter knew that a project was doomed to fail, then I think you would be correct. An underwriter should not sell a project that it knows is going to fail. Pardon? Doherty knew that this was going to fail. No, Doherty, I disrespectfully disagree. Doherty did not know this was going to fail. Doherty appreciated it, had risks, and announced those risks to the world and allowed sophisticated investors like Waddell to decide to weigh those risks in the balance and decide whether they wanted to take a risk which was well disclosed and known to all. The only other issue, if I may have 10 seconds, was the district court dismissed our request for attorney's fees on the grounds that it didn't have subject matter jurisdiction. We think that's clearly an error that the court had subject matter jurisdiction. You burned through all of your rebuttal time. You have no time left. I understand. Thank you. However, the case is complex enough. We may have questions or something may come up. On the fees, you mean? Oh, wait. You're the appellate. I'm sorry. You said on the fees. Thank you, Your Honor. Your Honors, I'll be very brief in my rebuttal and address just a few specific issues. The preliminary official statement, the POS, and this is a supplemental excerpt of Record 271. This is a draft document. There is no evidence in the record that as of this date, Doherty had committed to buy the bonds or that Doherty had become an underwriter. There was no evidence presented to the district court judge that Doherty's status had changed as of the date of this document. This also ignores the fact, focusing on the POS, that it's the offer to sell, not the commitment that we're concerned about here. In this case, Strang wasn't mistaken. He knows this because he's an underwriter and an agent, and he knows that you get into these deals as an agent to market them for an issuer. If the deal looks really good and you get a commitment, then maybe you become an underwriter. Strang knew the difference between that. That's what he did for a living. That's why his testimony that it was not until after the commitment from Doherty, after the offer and the commitment. Waddell and Reed, you mean? I'm sorry. I do. After the commitment through the offer and then the commitment by Waddell and Reed, that Doherty became an underwriter. Strang knew the significance of that difference and of that commitment. The other thing that's interesting about the preliminary official statement, if you look down at the very bottom, it says the bonds, and these are bonds. Bottom of what page? I'm sorry, page 271. Okay. It's the last paragraph. The bonds are offered subject to prior sale when, as, and if accepted by Doherty Dawkins. Doherty Dawkins hadn't committed to anything at this point. This was an offer that originated from the issuer. It says the bonds are offered if accepted by Doherty. Who was offering them? The issuer. Where's the issuer? Myrtle Creek, Oregon. Who were they offered to? Mr. Anthony's own words, they were offered to Waddell and Reed with this POS. In this instance, the offer that resulted in the purchase of the bonds originated from Oregon. If the panel doesn't have any other questions for me, I'll give the rest of my time up. Thank you very much. Thank you, counsel. Waddell and Reed v. Doherty is submitted.
judges: Ferguson, Kleinfeld, Graber